# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ELIZABETH R. LOVERIDGE, Chapter 7 Trustee for the Bankruptcy Estates of East Lake Care Center, LLC; Castle Country Care Center, Inc.; and South Valley Health Care Center, LLC, Plaintiff, v. JOHNSON LAND ENTERPRISES, LLC; SILVER LAKE HOLDINGS, LLC; RIVERVIEW HEALTHCARE, INC. PRICE HEALTHCARE, INC., JORDAN HEALTH ASSOCIATES, INC.; PATRICIAL JOHNSON; CRAIG JOHNSON; and BRUCE JOHNSON, Defendants. | **ORDER AND MEMORANDUM DECISION**<br><br>District Court No. 2:12–cv–01045–TC<br>Judge Tena Campbell<br><br>CONSOLIDATED MEMBER CASES:<br><br>Member Case: 2:12–01047<br>Member Case: 2:12–01051<br><br>RELATED BANKRUPTCY CASES:<br>Bankr. Case No. 10–28754<br>Bankr. Case No. 10–28751<br>Bankr. Case No. 10–28752 |

## INTRODUCTION[1]

In this consolidated adversary proceeding, the Plaintiff, Elizabeth Loveridge, is the Chapter 7 Trustee for three related bankruptcy cases. The bankruptcy debtors, East Lake Care Center, LLC (East Lake), Castle Country Care Center, Inc. (Castle Country), and South Valley Health Care Center LLC (South Valley), (Debtors) operate skilled nursing facilities. The Defendants Patricia Johnson, Craig Johnson, and Bruce Johnson own the Defendant Johnson Land Enterprises, LLC (JLE). They also own East Lake, Castle Country, and South Valley.

---

[1] Because the parties have given very lengthy descriptions of the factual background, the court will give only those facts necessary to explain its decision.

The center of the dispute is the sale of the Debtors by the Defendants to a California business, the Ensign Group (Ensign) and affiliates of Ensign.[2] The Trustee contends that the Defendants failed to give Debtors their share of the sale proceeds. The Defendants respond that at the time of the sale, Debtors had no interest in any assets that were sold and so were not entitled to anything.

The Trustee has filed a motion for partial summary judgment asking the court to find that: (1) the Debtors owned the intangible assets of the skilled nursing facilities immediately before the sale to Ensign; (2) the Debtors were insolvent immediately before and after the sale; (3) the Debtors received nothing from the sale; and (4) the parties intended that the twenty–three million dollar purchase price was for all the assets of the Debtors, including the intangible assets.

Because the court finds that there are disputed issues of material fact surrounding the questions of the ownership of the intangible assets and the insolvency of Debtors before the sale, the court denies the Trustee's motion on those issues. But there is no genuine dispute that the Debtors were insolvent after the sale, the Debtors received none of the proceeds from the sale, and the intent of the parties was that the twenty–three million dollars was for all of the assets of the Debtors. Accordingly, the court grants the Trustee's motion on those questions.

---

[2] The sale transaction was memorialized by the Purchase and Sale Agreement (PSA) signed by the parties.

The Defendants have filed a motion for summary judgment on all of the Trustee's causes of action. Because resolution of those causes of action depends upon whether Debtors owned the intangible assets at the time of the sale, a question the court cannot resolve at this time, the court denies the Defendants' motion.

## ANALYSIS

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(B); see also Justice v. Crown Cork & Seal Co., Inc., 527 F.3d 1080, 1085 (10th Cir. 2008). Examining that evidence, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).

1.  **Intention of the Parties to the PSA and OTAs[3]**

The intention of the parties to the PSA, according to the Trustee, was to sell every asset related to operating the facilities and to deliver title free and clear of encumbrances. (Trustee's Mot. for Partial Summ. J. 27, ECF No. 113 (Trustee's Mot.).) The plain language of the PSA also reflects that intent. (See PSA § 2.5, ECF No. 113-13.) Additionally, according to Gregory K. Stapley, Ensign's representative, Ensign not only entered into the PSA but aslo

---

[3] Operations Transfer Agreements.

simultaneously entered into Operations Transfer Agreements (OTAs) in order to achieve this goal. (Dep. of Gregory K. Stapley 95, ECF No. 114–1.) In his deposition, he explains the redundancy of asset listings between the PSA and the OTAs as a methodically prudent strategy to ensure that Ensign purchased everything related to the facilities.

> We did those separate bills of sale [OTAs], again, as part of sort of a belt–and–suspenders approach [the Debtors] signed to neutralize the fact that we frequently dealt with small operators who, while they were very good operators, sophisticated on the operations side, were typically anything but sophisticated when it came to their own corporate structures and where and how their accounting was done. It was just impossible to tell where things were.

(Id. at 88.)

> With respect to the transfer provisions of the Operations Transfer Agreement, it was merely a catchall to pick up anything that we could get that might have been held or might have been in question, because oftentimes we would find questions about who owned what. . . . [I]t [the OTAs] simply would refer to kind of very vaguely whatever you [operator and seller] have hold on, those kinds of things. . . . It's just kind of a way to say the current operator doesn't claim any of this stuff. . . . [T]hey [the operator and seller] usually didn't know because they typically didn't keep those things [assets] separate in their mind. They were running things monolithically.

(Id. at 105–06.)

Craig Johnson agrees with Mr. Stapley's interpretation of the purpose of the OTAs. "The Operation Transfer Agreement, in my opinion, was almost an overkill type of document that would have covered anything we left out or that somehow got omitted from the Purchase and Sale Agreement." (Errata App. to Trustee's Mem. in Opp'n to the Johnson Parties' Mot. for Summ. J. 65, ECF No. 123 (citing Dep. of Craig Johnson 28:3–7, ECF No. 113-3 (Johnson Dep.).) Further, JLE and the Johnsons "acknowledge that the purchase price of $23 million was intended to include all assets belonging to Johnson Land, a party, unlike the Lessee-debtors, to

4

the PSA and OTAs." (Defs.' Mem. in Opp'n to Trustee's Mot. for Partial Summ. J. 63, ECF No. 122 (Defs.' Opp'n).)

Finally, Defendants' counsel agreed that the twenty-three million dollars was intended to cover everything other than accounts receivable. (Tr. of Summ. J. Mot. Hr'g 22–23, Nov. 15, 2017, ECF No. 137 (Tr.).) The court, consequently, grants partial summary judgment on this issue of the Trustee's Motion and finds that Ensign intended to pay for all of the assets of the Debtors, less accounts receivable, and the Debtors intended to sell the same.

2. **Distribution of the Proceeds of the PSA and OTAs**

The Trustee contends that the Debtors received no consideration from the sale. (Trustee's Mot. 18.) Citing 11 U.S.C. § 548 (a)(1)(B), the Trustee seeks to void the transfer from JLE to Ensign because the Debtors "received 'less than a reasonably equivalent value' in exchange for the transfer." (Id.) "Ensign paid the entire purchase price of $23.0 million by paying approximately $13.0 million to satisfy obligations or exercise purchase options on the real property and by delivering $10.0 million in promissory notes payable to JLE." (Id. at 26). Finally, the Trustee alleges that because the Debtors received no consideration for the sale of their assets, which would have gone a long way to paying off the Debtors' debts, JLE and the Johnsons are liable for numerous equitable claims. (Id.)

JLE and the Johnsons agree with the Trustee that the Debtors received no proceeds from the sale. But they claim that the Debtors were only lessees and were not entitled to any proceeds. (Defs.' Opp'n 63.) Because the Debtors received no proceeds from the sale, the court grants partial summary judgment for the Trustee on that issue.

5

3. **Insolvency Before and After the PSA**

   i. <u>After the PSA</u>

Initially, the Defendants disputed that the Debtors were insolvent after the sale. (Defs.' Opp'n 40.) But they conceded the issue during the motion hearing.

> MR. HAL REISER: We start with the proposition that there was insolvency after the sale, which, because Debtors owned nothing would be true.

(Tr. 7.)

Because there is no longer a factual dispute about this issue, the court finds that after the transaction the Debtors were insolvent.

   ii. <u>Before the PSA</u>

The Trustee asserts that before the sale, the assets were not merely encumbered but that the Debtors were insolvent. She maintains that even using Defendants' expert's numbers—numbers most favorable for the Defendants—each of the facilities was still insolvent. (Trustee's Mot. 128–32.)

Defendants, in contrast, reject the argument that they were insolvent before the sale. Instead, they admit only financial difficulties. The Debtors "were in default on two loans encumbering the Utah County facility [Provo/East Lake facility] and the Salt Lake County facility [West Jordan/South Valley facility]." (JLE's Responses to Trustee's First Set of Discovery Requests 4, ECF No. 77-3.) The "Trustee's sales were imminent as well as motion[s] to appoint receivers to liquidate the properties." (<u>Id.</u> at 7.) In fact, "the real property was being sold under the PSA to avoid foreclosure and appointment of receivers." (<u>Id.</u> at 8.)

6

With regard to the Trustee's expert's numbers, the Defendants challenge the Trustee's expert (Barbra Smith) and her calculations. (Defs.' Opp'n 40.) They allege that the reports she relied on to generate the numbers contradict each other. (Id.) Finally, they also question her valuation of the Debtors' assets. "Barbra Smith took the book value of the accounts receivable, not the actual amount collected." (Tr. 7.)

As a final point, Defendants support their arguments against insolvency before the sale with reference to a disputed debt with Superior Care Pharmacy. (See Defs.' Opp'n 36–40.) Defendants and Superior are concurrently litigating that debt in the Utah state courts.[4] (Id.) A favorable ruling for JLE, were it to have come before the Debtors were sold, might have resolved their debt. (Id.; see also Tr. 18–19.)

Notably, Ms. Smith performed a calculation that included a favorable outcome for the Debtors. (Trustee's Reply Mem. in Supp. of Mot. for Partial Summ. J. 17, ECF No. 133.) Even taking the Defendants' numbers and a favorable ruling for the Debtors in the dispute with Superior, Ms. Smith demonstrated that East Lake, South Valley, and Castle Country still had negative net equity of $369,868, $130,000, and $30,099, respectively. (Id. 17–18.)

Although this may be true, if one were to assume that the Debtors actually did own the intangible assets that were sold, then the value of those assets might also serve to move them from red to black on their ledgers. But it is not clear what the Debtors owned. Given that it might be factually possible for them to pay off their debts, the court denies granting summary judgment on this issue.

---

[4] See Superior Care Pharmacy v. Johnson Land et al., Civil no. 090916144.

7

4. **Ownership of the Intangible Assets**

The Trustee's central issue for partial summary judgment, and the key issue in the Defendants' Motion, is whether the Debtors owned the intangible assets. The Defendants maintain that they could not have sold anything belonging to the Debtors because "at no time have the Lessee–debtors ever owned any of the Leased Property[,] and consequently[,] the Leased Property never became property of the Lessee–Debtors' Bankruptcy Estate." (Defs.' Mot. 24.) According to the Defendants, they simply took their leased property back from the Debtors. (Id. at 34). The Defendants seek to support this argument with a recent declaration of Mr. Craig Johnson, which included a memorandum of lease termination. (See Decl. of Craig Johnson in Supp. of Mot. for Summ. J., ECF No. 127 (Johnson Decl.); Johnson Decl. Ex. A, ECF No. 115-1 at 87-89 (Exhibit A).)

The Trustee insists that this very idea, which is articulated in the 2017 declaration, undercuts earlier statements Mr. Johnson made during a 2015 deposition and is nothing more than a sham. (See Johnson Decl.;Johnson Dep.)

> The revised Two–Step Transfer theory has been set forth for the first time in this litigation in the [Defendants'] Motion for Summary Judgment. Despite at least 6 prior instances during which the Johnsons have testified about the PSA transaction under oath, and despite multiple sets of written discovery responses served in the case, the Motion is supported almost exclusively by testimony set forth in a Declaration of Craig Johnson in Support of Motion for Summary Judgment filed with the Motion. . . . Trustee has objected to this Declaration as an effort to create a "sham" issue of fact.

(Trustee's Mem. in Opp'n to the Johnson Parties' Mot. for Summ. J. 3, ECF No. 121 (Trustee's Opp'n).)

In order to determine whether the testimony is a sham, the court examines three factors: 1) was the affiant "cross–examined during his earlier testimony," 2) did the affiant have access to "pertinent evidence at the time of his earlier testimony" or was the affidavit "based on newly discovered evidence," and 3) does the earlier testimony reflect "confusion which the affidavit attempts to explain." Ralston v. Smith & Newphew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001). To determine whether the newly-filed affidavit was "within the ambit of creating a 'sham fact issue,'" the Ralston court excluded subsequent affidavits that "directly contradicted certain positions previously taken." Id. On the other hand, the court should not dismiss subsequent affidavits without "identify[ing] how the affidavits conflicted with prior deposition testimony." Law Co., Inc. v. Mohawk Const. & Supply Co., 577 F.3d 1164, 1167 (10th Cir. 2009).

Here, the transcript of the 2015 deposition clearly shows that the Trustee had the opportunity to cross examine Mr. Johnson, which is not in dispute and satisfies the first factor. (See Johnson Dep.) Looking at the second factor, Defendants do not claim that they did not have pertinent evidence at the time of their depositions or that they have discovered new evidence. But they do present a memorandum of lease termination of the East Lake Lease, which was also cited to the declaration. (See id. at 195:10-97:19; Johnson Decl. ¶¶ 22-23, ¶ 33; Exhibit A at 87-89; Trustee's Opp'n 13.)

While these factors would seem to favor finding that the 2017 Declaration is a sham, the Trustee fails to cite direct contradictions which would indicate that it is. Consequently, she has not met her burden, and the court will resolve this issue at trial.

9

5. **Issues Remaining for Trial**

As noted above, the court declines to resolve the equitable claims in Trustee's Second Amended Complaint. The court will resolve those claims—avoidance of fraudulent transfer, preferential transfer, unjust enrichment/constructive trust, and reformation of the PSA—following the bench trial.

**ORDER**

For the foregoing reasons, the court orders as follows:

1. The Defendants' Motion for Summary Judgment (ECF No. 126) on all counts is DENIED.

2. The Trustee's Motion for Partial Summary Judgment (ECF No. 113) is GRANTED IN PART and DENIED IN PART:

    a. On the claim that the Debtors owned the intangible assets, the motion is DENIED;

    b. On the claim that the Debtors were insolvent before the sale of the intangible assets, the motion is DENIED;

    c. On the claim that the Debtors were insolvent after the sale of the intangible assets, the motion is GRANTED;

    d. On the claim that Ensign paid for everything that the Debtors owned, excepting only the accounts receivable, the motion is GRANTED;

e. On the claim that the Debtors received no consideration from the transaction between Ensign, JLE, and the Johnsons, the motion is GRANTED.

DATED this 12th day of December, 2017.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL

U.S. District Court Judge